UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
                                 .  Case No.  11-10219-mew
IN RE:                           .
                                 .  Chapter 7
KENNETH IRA STARR,               .
                                 .
          Debtor.                .
. . . . . . . . . . . . . . . . .
ROBERT L. GELTZER, AS CHAPTER 7  .  Adv. Proc. 15-01100
TRUSTEE OF IRA STARR,            .
STARR & COMPANY, LLC, AND        .
STARR INVESTMENT ADVISORS, LLC,  .
                                 .
          Plaintiff,             .
     v.                          .  One Bowling Green
                                 .  New York, NY  10004-1408
KEITH BARISH,                    .
                                 .  Wednesday, July 1, 2015
          Defendant.             .  10:38 a.m.
. . . . . . . . . . . . . . . . .
```

TRANSCRIPT OF ADVERSARY PROCEEDING 15-01100-MEW
PRETRIAL CONFERENCE;
MOTION BY DEFENDANT TO DISMISS COMPLAINT
**BEFORE THE HONORABLE MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY COURT JUDGE**

APPEARANCES:

```
For the Plaintiff:        Tarter Krinsky & Drogin
                          By:  ROBERT A. WOLF, ESQ.
                               GREGORY J. SKIFF, ESQ.
                          1350 Broadway, 11th Floor
                          New York, NY  10018
                          (212) 216-8000

For the Defendant:        Bilzin Sumberg Baena Price & Axelrod
                          By:  JEFFREY I. SNYDER, ESQ.
                               SCOTT BAENA, ESQ. (Telephonic)
                          1450 Brickell Avenue, Suite 2300
                          Miami, FL  33131
                          (305) 375-6148

Audio Operator:           F. Ferguson, ECRO

Transcription Company:    Access Transcripts, LLC
                          10110 Youngwood Lane
                          Fishers, IN 46038
                          (855) 873-2223
                          www.accesstranscripts.com
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1     (Proceedings commence at 10:38 a.m.)

2              THE COURT:  Good morning.

3              MR. SKIFF:  Good morning, Your Honor.

4              MR. SNYDER:  Good morning, Your Honor.

5              MR. WOLF:  Good morning.

6              THE COURT:  Why don't you enter your appearances and

7     then we'll proceed.

8              MR. SKIFF:  Your Honor, my name is Gregory Skiff, I'm

9     here on behalf of the plaintiff, Robert L. Geltzer, as Chapter

10    7 trustee of Kenneth Ira Starr, Starr & Company, LLC and Starr

11    Investment Advisors, LLC.

12             MR. WOLF:  Good morning, Your Honor.  Robert A. Wolf,

13    as with Mr. Skiff, with Tarter Krinsky & Drogin, counsel for

14    the trustee.

15             As I did last week, Your Honor, I'd also like to note

16    the presence of our summer associate, who is Rachel Klein, who

17    is going into her third year of law school at Cardozo.

18             THE COURT:  You're welcome.

19             MR. SNYDER:  Good morning, Your Honor, Jeffrey Snyder

20    of Bilzin Sumberg on behalf of defendant, Keith Barish.  I

21    believe also on the telephone is my partner, Scott Baena.

22             THE COURT:  Okay.  All right.  We have Mr. Barish's

23    motion to dismiss.  Counsel, you want to proceed?

24             MR. SNYDER:  Thank you, Your Honor.  I want to begin

25    by taking a moment to provide a little bit of context.  I need

1   not tell Your Honor that Starr pleaded guilty to a massive

2   fraudulence scheme, but what Your Honor may not know is that my

3   client was himself a victim.

4         Mr. Barish was a very successful man.  He was a

5   Hollywood director, directed "Sophie's Choice" and "The

6   Fugitive," among others, and co-founded the Planet Hollywood

7   chain.  And Mr. Starr used his assets, arranged for bank lines

8   secured by his assets, used those proceeds, too, and as a

9   result of Mr. Starr's supposed tax services, prior to the

10  period covered by the complaint, Mr. Barish has no assets and

11  is subject to numerous tax liens.

12        Despite this, Mr. Barish and his family have spent

13  the last two years being further victimized by lawsuits by this

14  trustee.  He's suing Mr. Barish's son --

15        THE COURT:  How much assets were -- did you say were

16  stolen by Mr. Starr?

17        MR. SNYDER:  The -- I can't give you a precise

18  number, I believe the amount of tax liens is about 8 million,

19  but the amounts of the bank lines I'm not -- I don't have at

20  the tip of my tongue.  But basically what he did is he arranged

21  bank lines with Bank of America and UBS and then used those

22  proceeds.  And as a result, the banks basically have all of his

23  assets.

24        The trustee sued Mr. Barish's son in an adversary

25  proceeding, in front of Judge Gropper for over $5 million,

1 which was dismissed.  And when the trustee took an appeal, it

2 was settled for less than half of what the trustee had incurred

3 in fees to bring on the litigation.

4         And now we're going after Barish himself, contending

5 that Barish owes Starr & Company a flat fee of $20,000 per

6 month, right up until the time that Mr. Starr was arrested, for

7 unspecified professional services.  But they don't allege that

8 there was an agreement, but rather the Ponzi scheme apparently

9 generated invoices and sent them to itself.  And so perhaps

10 Your Honor can appreciate why my client is upset.

11         In his response, the trustee agreed to withdraw the

12 turnover claim, so I'll address --

13         THE COURT:  What he's -- I think what the trustee has

14 said, at least in other contexts, is that there may have been a

15 Ponzi scheme going on, but there was also a legitimate

16 business, much as Madoff had a Ponzi scheme but also had a

17 legitimate regular brokerage and trading business.

18         MR. SNYDER:  The --

19         THE COURT:  And I take it that the 20,000 per month

20 and other charges they're seeking here are not through the

21 Ponzi scheme?

22         MR. SNYDER:  The -- well, it's not -- yeah, it's not

23 money that was invested, it's -- their complaint alleges that

24 there were unspecified professional services provided.  You

25 know, and that's one of the concerns is New York law requires

an accountant to keep their work papers for seven years, but they can't tell us what they did, when they did it, or what the reasonable value of their services are. They don't have an agreement, and their response to that -- their response is basically that Mr. Barish didn't provide the agreement in response to a 2004 request. Well, he testified at that exam that he doesn't have it. We don't have an agreement. I'll make that real clear on the record, we don't have an agreement or an engagement letter or something to produce that's going to change those facts.

And they can't -- and with respect to the quantum meruit claim, they can't tell us what services were provided who provided them, when they were provided, or what the purported value is or what the tie is, if any, to this $20,000 flat fee, un-itemized amount. And moreover, given that it was a Ponzi scheme --

THE COURT: But some of that --

MR. SNYDER: -- there's an issue with good faith as well.

THE COURT: Some of that, as to the quantum meruit claim, it sounds like you're criticizing their case on the merits, rather than their case as pleaded. The pleading, granted, doesn't say X person on X date did Y hours of time doing exactly such and such, but that's not what the pleading is required to do. The pleading alleges the type of services

that were performed, it alleges the time period during which
they were performed, and it says they were performed by the
plaintiff entity and its employees.  So for pleading purposes,
why isn't that enough?

You may be right, maybe they -- all they have is a
record and they'll never be able to explain it at trial, and
never be able to prove it.  But for a motion to dismiss, I'm
just supposed to look at the complaint.  What's wrong with
those allegations?

MR. SNYDER:  Well, I understand that.  You know, I
would submit that the case law, and several of the cases we
cite in the motion, suggest that more detail is required.

THE COURT:  At summary judgment.

MR. SNYDER:  The -- well, the <u>Singerman v. Reyes</u> case
and the North -- the <u>DeSilva v. North Shore</u> case, for example,
were both at -- on 12(b)(6) motions.  The -- you know, how is
it that we are to know -- I mean, there's a single paragraph in
the complaint that just says "unspecified professional services
over a period of four years."

THE COURT:  That's not true.  That's not at all true.
It doesn't say unspecified professional services.  Paragraph 16
says they provided professional services, including tax
preparation services, preparation of periodic financial
statements, negotiations with taxing authorities to resolve
alleged tax liabilities, negotiations with certain banks

1 regarding defendant's alleged liabilities on various loans,

2 consulting and advisory services and other financial related

3 services.

4          And it doesn't say over a four-year period.  The next

5 paragraph speaks of beginning in January, 2009 and ending in or

6 about May, 2010.

7          MR. SNYDER:  Well, that paragraph is referring to the

8 invoices.

9          THE COURT:  Right.

10          MR. SNYDER:  Really I'd suggest that Paragraph 16 is

11 the only paragraph that is addressing what services were

12 provided and we think they have those records, they have that

13 information they ought to be able to give to us.  They ought to

14 be able to tell us who the professionals were who were

15 providing these services and what the services were; they

16 should have those work papers.

17          And with respect to the account stated claim, I think

18 that they don't allege the existing of an agreement, they don't

19 --

20          THE COURT:  They allege that account statements were

21 sent and weren't objected to.

22          MR. SNYDER:  That's correct.  But the statements

23 themselves reflect otherwise.  They attached the complaint --

24 the statements and the statements are sent to Keith Barish,

25 care of Starr & Company which --

1          THE COURT:  Well, the statements don't prove they

2   were sent to Mr. Barish, but they don't foreclose that

3   possibility either.

4          MR. SNYDER:  They -- I mean, I --

5          THE COURT:  And the complaint alleges that they were

6   sent to him.  Now maybe that's wrong, maybe some day you'll

7   complain to me that they had no good faith basis to believe

8   they were sent to him, but the complaint alleges that they

9   were.   It says, in Paragraph 23 that S&C provided the

10  defendant with monthly statements of account.

11         MR. SNYDER:  Well, the --

12         THE COURT:  It doesn't say that it was sent only to

13  the address that's reflected on the statements and never

14  otherwise provided by Mr. Barish -- to Mr. Barish, which is the

15  implication you want me to draw.  But that's a factual

16  argument.

17         MR. SNYDER:  Well, I mean they --

18         THE COURT:  It's -- you know, if you're right, then

19  you may have a Rule 11 issue, or you may win on the merits, but

20  from a pleading point of view, it says they gave it to the

21  defendant.

22         MR. SNYDER:  Well, right.  The use of the word

23  "provided" is a little curious.  And in the response they don't

24  say -- they don't clarify that their position is that it was in

25  fact sent to Mr. Barish, they say -- it makes perfect sense

that they were -- that Starr sent them to itself, because Starr
was supposedly managing Mr. Barish's money. So they
acknowledge. And maybe that's true, and if -- but how could
that support an account stated claim, if they're acknowledging
that Starr sent the invoices to itself?

   THE COURT: Did your client receive these?

   MR. SNYDER: No. And they're -- so the complaint
alleges a debtor/creditor relationship and not agreement. The
trustee agrees, in the response, that they weren't actually
sent to Barish, so how could he have acquiesced. And if Starr
was managing Barish's money, as it says in the response, why
didn't he just take the $20,000 a month?

   Your prototypical account stated claim is your -- you
know, is your credit card relationship, there's an existing
agreement, the statement gets sent, a statement gets paid, a
statement gets sent, a statement gets paid, and so on and so
forth. And after a period of time you can assume acquiescence.
But here there's no allegation that the $20,000 was ever paid,
that there was ever -- it's not that the $20,000 was paid and
then they paid stopped paying, or Starr was taking the $20,000
from Barish's money and then ceased to do so and that's why
it's outstanding. I mean it really doesn't make -- it's just
not plausible that he was -- that if -- the explanation and the
response really -- and the invoices themselves really
contradict the notion of an account stated plan.

1          THE COURT:  Okay.  Let me hear from the plaintiff on

2   this one.

3          MR. SNYDER:  Certainly.

4          MR. SKIFF:  Good morning, Your Honor.

5          THE COURT:  Is it true that Mr. Barish is a victim of

6   the Ponzi scheme?

7          MR. SKIFF:  I don't know.  I can't speak to that

8   issue.  But what I can speak to, as Your Honor pointed out, and

9   as we pointed out on other motions similar to this in similar

10  adversary proceedings, Mr. Starr's fraud and the Ponzi scheme

11  have nothing to do with the legitimate business of Starr &

12  Company, which performed legitimate services on behalf of their

13  clients.

14         THE COURT:  But I understand that argument when

15  you've been seeking to collect financial fees from clients who

16  were not victims of the Ponzi scheme.  But you've got

17  substantively consolidated cases, don't you?

18         MR. SKIFF:  Yes, we do.

19         THE COURT:  So if Mr. Barish is a victim of the Ponzi

20  scheme, doesn't he have an offset claim that would dwarf the

21  fees that you're seeking?

22         MR. SKIFF:  He may very well have that, and we would

23  like to see that in a responsive pleading.  However, I will

24  point out that Mr. Barish did not file a proof of claim in this

25  bankruptcy.  And there's been --

1          THE COURT:  He doesn't need to, to have an offset,

2  does he?

3          MR. SKIFF:  No.  But it would have been indicative of

4  a fraud perpetrated on Mr. Barish.  And on top of that he --

5          THE COURT:  Is there a list of who the victims of the

6  Ponzi scheme were?  There must be, in connection with the

7  criminal cases or somewhere else.

8          MR. WOLF:  If I may, Your Honor.  Yes, there is.

9  There were nine victims listed as part of the schedule to the

10  criminal restitution judgment entered in Mr. Starr's criminal

11  case.  Mr. Barish is not one of those individuals.

12          On behalf of the trustee, I personally, on behalf of

13  my firm as counsel, sought an unsealing of that schedule so we

14  could have disclosed to us the names of the specific victims,

15  because we needed to know which victims were listed, how much

16  they got in restitution, because that might obviously affect

17  the amounts of the claims, if any, that they filed against the

18  bankruptcy estate in this case.

19          Mr. Barish is not one of those listed criminal

20  victims, nor, as Mr. Skiff pointed out, did he ever file a

21  proof of claim.  And I did --

22          THE COURT:  How was the list of restitution victims

23  determined?  Were these people who filed claims in response to

24  solicitations from the Justice Department or something else?

25          MR. WOLF:  I do not know if in fact they responded to

1  solicitation.  I do know that, Your Honor, that the original

2  indictment and/or criminal complaint filed by The United States

3  made mention of these particular victims by number, Victim

4  Number 1, Victim Number 2, et cetera, in separate counts of the

5  indictment and/or the criminal complaint.

6          And then I believe it was winnowed down further,

7  because there were more victims in that indictment and the

8  criminal complaint than were listed on the schedule appended to

9  the ultimate criminal judgment.  Whether there was also

10 solicitation, I do not know on that.

11          THE COURT:  Okay.  Proceed.

12          MR. WOLF:  But Your Honor, if I may just add, I was

13 the attorney who did conduct Mr. Barish's Rule 2004 exam nearly

14 two and a half years ago in this case.  And I specifically

15 asked for documentation that supported Mr. Barish's contention

16 that he was somehow a victim here.  I don't recall him

17 contending he was a victim of the "fraud or Ponzi scheme," but

18 his contentions had to do with certain alleged tax liabilities

19 that he had incurred, which he claimed were the result of

20 negligence, my words, on the part of Mr. Starr and/or his

21 company, in entering into what was a compromise on behalf of

22 Mr. Barish with the Internal Revenue Service.  But none of

23 those documents were forthcoming, we've never had those

24 documents produced to us.

25          THE COURT:  Okay.

1      MR. SKIFF:  So, Your Honor, the motion to dismiss,

2  made by the defendant should be denied for three reasons.  The

3  first is that the defendant disregards the legal standard

4  that's applicable to their own -- to his own motion by

5  attacking the plaintiff's documents that we attached to the

6  complaint, which we weren't obligated to do, but we did attach

7  certain invoices to give some color to the allegations, and

8  relying on conclusory averments that are outside --

9      THE COURT:  But you not only attached them, you said

10  that they were the statements of account on which you are

11  basing your claim.

12      MR. SKIFF:  Correct.

13      THE COURT:  And by attaching them, you've

14  incorporated them into the complaint.

15      MR. SKIFF:  Absolutely, Your Honor.  And so -- and --

16      THE COURT:  One of the arguments the defendant has

17  made is that the -- these are periodic invoices, but they don't

18  state a running account, they don't state an amount, a

19  cumulative amount due.  What's your response to that?

20      MR. SKIFF:  Well, they may not state a running

21  account, but we believe that the documentation in the trustee's

22  possession will show that there was a running account and that

23  Mr. Barish was well aware of that running account.  And whether

24  it was actually listed on the statement or not, the statement

25  for each month for that $20,000 that was due each month was

1 clear and unambiguous.

2      The second reason, Your Honor, is that the

3 defendant's contention regarding the deficiencies in the

4 plaintiff's allegations are belied by the complaint themselves.

5 As you pointed out, it's not true that we don't allege the

6 professional services that were rendered, we do.  We

7 specifically state which services were rendered.

8      And I would also suggest that, moving away from the

9 motion to dismiss, that documentation in the trustee's

10 possession, the trustee's court-appointed accountants will

11 further demonstrate which -- what professional services were

12 provided, as well as documents that may be in the defendant's

13 possession that he's refused to produce, as the result of the

14 Rule 2004 examination, where documents were asked of him, over

15 two and a half years ago, to be produced, he never produced

16 them.  And despite repeated requests, as well as predicating

17 this adversary proceeding, have never been produced.

18      And third, Your Honor, viewing the allegations in the

19 light most favorable to the plaintiff, the plaintiff has

20 plausible claims for account stated in quantum meruit under the

21 Iqbal/Twombly standard.  You may recall, Your Honor, we were

22 here last week on a similar matter, the adversary proceeding

23 versus Taine (ph) and in that matter, it was the same as it is

24 here, it was a motion essentially for summary judgment, couched

25 as one to dismiss.  And there Your Honor found that further

1  documentation was needed for you to determine the issues that

2  were being brought forth.

3         THE COURT:  That was a much different issue.  The

4  allegation there was that I couldn't trust any of the records

5  that the Starr Company maintained and I should disregard them

6  all and treat them all as fraudulent, which obviously I could

7  not do on a motion to dismiss.

8         MR. SKIFF:  Respectfully, Your Honor, I believe

9  that's what the defendant's saying here.  That as a result of

10 the Ponzi scheme, the records -- the invoices are not to be

11 believed.  that -- and in fact I think they even, in their

12 papers, say that one can only imagine where these averments

13 come from.

14        THE COURT:  Well, if I recall right, directly in a

15 lot of your complaints you've alleged there was an actual

16 agreement to pay and a breach of contract.

17        MR. SKIFF:  Yes.

18        THE COURT:  You haven't done that here.

19        MR. SKIFF:  Well, Your Honor, in this situation, the

20 testimony of the defendant, in the Rule 2004 exam, he actually

21 admits that there were agreements with Starr --

22        THE COURT:  Oral agreements.

23        MR. SKIFF:  -- so it's -- I'm sorry?

24        THE COURT:  Oral agreements or written agreements?

25        MR. SKIFF:  No, he says written, that there may have

1  been one, two, if not three written agreements with Starr.  So

2  it's disingenuous to --

3          THE COURT:  Nobody can find them?

4          MR. SKIFF:  What's that?

5          THE COURT:  Just that nobody can find them or what?

6          MR. SKIFF:  Well, we don't have them in our

7  possession, but we did request them, as part of our demands to

8  the defendant in the Rule 2004 exam and so that's why it's --

9  the defendant cannot, on one hand, attack the documents that

10  were submitted to the -- attached to the complaint as being,

11  you know, insufficient to give rise to a plausible claim, but

12  on the other hand refuse to provide the documents that we've

13  asked for that would buttress those claims.  We believe, also,

14  that there are additional documents that we would receive in

15  discovery that would further support those claims.

16          With respect to the claim for quantum meruit --

17          THE COURT:  Let me get back to the issue of whether,

18  for an account stated you need to send a document that isn't

19  just a periodic invoice, but that shows the accumulative status

20  of the account.  The documents you attached to your complaint

21  don't do that.

22          MR. SKIFF:  They do not, Your Honor.

23          THE COURT:  And is that a requirement for an account

24  stated claim?

25          MR. SKIFF:  It may be a facial requirement if you're

1  relying only on the statements themselves, but where there's

2  other documents to support the idea that there was an

3  agreement, that there's an expectation of payment, and that the

4  defendant accepted those statements and did not object to them,

5  we believe that that goes into the bounds of evidentiary proof

6  --

7          THE COURT:  Right, but --

8          MR. SKIFF:  -- not a facial --

9          THE COURT:  -- to the extent that there was an

10 agreement and a failure to pay, I would agree you'd be entitled

11 to pursue that claim, but in this particular complaint you

12 didn't plead it.  You only had pleaded account statement --

13 account stated and quantum meruit, you didn't plead an

14 agreement.

15         MR. SKIFF:  Your Honor, we believe that the -- not

16 only do the allegation in Paragraph 16 of the complaint, that

17 establishes -- that states the professional services that were

18 rendered, as well as the defendant's acceptance of those

19 services, gives rise to an implied agreement.  And in fact, the

20 case law cited by the defendant establishes that there can be

21 an implicit agreement, there does not have to be an expressed

22 agreement.  And where the parties have an ongoing mutual

23 relationship, which according to the defendant's own testimony

24 at the Rule 2004 exam, shows that there was a relationship as

25 early as 1996, extending up through to -- up through and to, at

1  least he acknowledges, 2005, 2006, for him to suggest that

2  there's no agreement, no relationship, is disingenuous.

3      In fact, the documents -- again, going back to the

4  documents that we requested would show and help establish that

5  that relationship continued on through beyond 2005 and into

6  2010, as we allege in the complaint.

7      THE COURT:  And Mr. Barish's counsel said there's no

8  allegation that these fees were ever collected in the past.  Is

9  there evidence that $20,000 a month was collected in the past?

10     MR. SKIFF:  That's one of the things we're looking

11 for from the defendants, Your Honor.  But the -- we do have

12 documentation to suggest that there was an arrangement that was

13 being made with the defendant whereby he would be paid on these

14 invoices, maybe not exactly when they were sent out, but that

15 there was a running total being kept, that the defendant was

16 aware of that running total, that there would be a day of

17 reckoning where it would be sort of worked out.

18     That goes, again, further into the evidentiary proof

19 that we have, and that would come out in our motion for summary

20 judgment or at trial, but certainly not appropriate for a

21 motion to dismiss.

22     With respect to the quantum meruit claim, the

23 defendant also contends that we failed to plead the elements

24 for a claim for quantum meruit.  He relies on a case that says

25 that the services have to be properly documented and then

attacks our complaint as having not -- as having not properly
documented those services, because these statements of account
do not actually list, in detail, the services being performed.
But we believe that's a misinterpretation of that case law.
Whether the services were properly documented, is an issue of
evidentiary proof for trial, it's not one for a motion to
dismiss in the pleading stage.

          And we do believe, as I've mentioned before, that the
trustee's in possession of documents that will properly
document which services were performed, that the documents that
were created themselves are the best evidence of that, as well
as documents that we would like to see from the defendant in
discovery.

          THE COURT:  When did you serve your Rule 2004
subpoena?

          MR. SKIFF:  I believe it was approximately two and a
half years ago.  There was -- there were document requests
made, during the examination, and then follow up requests made.

          THE COURT:  Oh, forget about during the examination,
talk about the subpoena itself.  Were there document requests
in the subpoena?

          MR. SKIFF:  I --

          MR. WOLF:  If I may, Your Honor?  I was at another
firm then and was representing the trustee.  Yes, there were.
There was a specific list within the order granting the trustee

1 the right to conduct the 2004 exam and, respectfully, just as

2 importantly, there was a paragraph in the order, and I believe

3 a copy of the order is next, as the first exhibit to our

4 opposition to the motion to dismiss, there's a decretal

5 paragraph in the order that explicitly stated that the -- Mr.

6 Barish was under an obligation to also produce, to the trustee,

7 any documents requested during the course of the exam, or

8 subsequent to the exam, as a result of the testimony he

9 proffered at the exam itself.

10      And that's what happened.  When I took the exam with

11 Mr. Barish back in February of 2013, during its course I

12 specifically asked for production of certain additional

13 documents as a result of testimony he gave, including

14 production of the agreements that he testified to as having

15 existed, at least one, if not two or three in number.  And

16 there were other documents also including this issue with

17 regard to his alleged tax liabilities.

18      And further requests were made, by me, on behalf of

19 the trustee, subsequent to that exam for those documents,

20 through and including over the last few months.  And next as

21 exhibits my letter demands for such documents.

22      THE COURT:  The subpoena was issued out of the

23 Florida court was it or was it issued out of here?

24      MR. WOLF:  I do not believe -- I could be wrong, but

25 I do not believe there was a subpoena, per se.  It was in the

order itself that required the production of documents. It was
appended to the order -- the exhibits. And --

THE COURT: The Rule 2004 order?

MR. WOLF: I'm sorry?

THE COURT: There was no actual subpoena issued?

MR. WOLF: I don't recall there having been a
subpoena, but the order did not require a subpoena to be
issued. And no objection to it was brought then and we worked
out, with counsel for Mr. Barish, that the exam would take
place up here in New York.

THE COURT: It strikes me that as a technical matter
you're pleading on the account stated, it falls slightly short,
because the documents you attach do not have an updated
statement of account or a rolling account balance. And while
you say that there are other documents that do, and that you
didn't intend to be exclusive about the ones you attached to
your complaint, that's not what your complaint says.

It says, in Paragraph 17, that attached as Exhibit A
are copies of each of the statements of account. And it
appears to be saying that these are them, and there aren't
others that you are relying on. So by your own admission, they
don't have a running statement of account, so I think in that
respect your complaint falls short.

I agree with you that the quantum meruit case as
pleaded is fine. It's going to be very hard for you, I

1  suspect, to prove who did what when for this entity that you
2  kind of have taken over as trustee, but that's not on the
3  pleading issue.  And certainly I will give you leave to re-
4  plead if you want to restate the account stated claim or simply
5  allege that there was a matter of agreement.
6      MR. SKIFF:  Yes, I would, Your Honor.
7      THE COURT:  I'll issue an order to that effect.  As
8  to the Rule 2004, I have no motion before me to enforce the
9  Rule 2004 subpoena.  Depending on where the subpoena was issued
10 from, I don't know whether that's a motion appropriately made
11 to me or not.  But I haven't actually heard from Mr. Barish's
12 counsel about that, so let me hear from him.
13     MR. SKIFF:  Sure.  If I may, Your Honor, just to
14 provide you with some information on that.  Exhibit A to our
15 motion papers is the order authorizing the trustee to conduct
16 the examinations.  And that's what attaches the schedule that
17 requires -- that lists the documents that needed to be
18 produced.
19     THE COURT:  Usually though, a Rule 2004 order
20 authorizes discovery to proceed, which means that a subpoena is
21 issued, not that the person shows up for examination based on
22 the authority of the order itself.
23     MR. SNYDER:  Thank you.  With respect to the Rule
24 2004 exam, as best I understand it, what happened was there was
25 a deposition, an examination taken on February 1st of 2013, and

then over two years pass and we get a letter from Mr. Wolf attaching a draft complaint and demanding additional document production from Mr. Barish.

I'd submit that's improper once a complaint's been served it's kind of one-sided discovery that now should be under the Rule 7000 rules, but we responded to it, and we responded reasonably. And we provided the trustee with a disk that contained over 1,800 pages obtained from a FOIA request made of the IRS by Mr. Barish's tax lawyers. They had made that request to try and figure out what it is that actually went on during Starr's involvement.

We did exactly what we said we would. We inquired of Mr. Barish's tax attorneys, who have advised us they don't have 2006, 2007 and 2008 returns. Mr. Wolf already has 2005 on the disk and 2009, which he asked Mr. Barish about at the exam. We don't have an engagement letter, we don't have an agreement. Mr. Barish testified to that at the 2004 exam. He said there may have been some agreements, but he doesn't have them.

What have they been doing for the past four years or for the past two, since Mr. Barish's 2004 exam? We're not going to provide them with an agreement that's going to make their case. And by the way, if we did, that would preclude the quantum meruit claim, under New York law, if an agreement did exist. But --

THE COURT: I think he'd be happy to give you the

1  quantum meruit claim, if you gave him the agreement.

2            MR. SNYDER:  But there -- I mean, we are not aware of

3  an agreement.  While there may have been agreements between

4  Barish and Mr. Starr over the life of their relationship, we

5  are not aware of any agreement providing for a $20,000 flat

6  fee, and they don't appear to be either.

7            THE COURT:  Okay.  What is the nature of the error

8  you -- or negligence you contend Mr. Starr committed on the tax

9  issues?

10           MR. SNYDER:  The issue relates to a offer in

11 compromise which in respect of I believe it was Mr. Barish's

12 2003 tax return, so before the period that we're dealing with

13 here.  And basically what happened was Mr. Starr had prepared

14 and submitted an offer in compromise to the IRS, I believe it

15 was an amended one or a second one that was ultimately accepted

16 by the IRS, and then failed to make the payments consistent

17 with the offer in compromise that he was required to make,

18 which resulted in all of the tax liability coming back as

19 admitted and tax liens being --

20           THE COURT:  So you lost the benefit of the compromise

21 and you had to pay interest and penalties?

22           MR. SNYDER:  Well, yeah, exactly.  Exactly.  And of

23 course Mr. Barish wasn't in a position to do that and there's

24 tax liens that still haunt him as a result.  And so if it comes

25 to it, obviously that kind of thing may show up as a

1 counterclaim.

2         THE COURT: Well here's what I don't understand.
3 Lawyers too often get kind of stuck at the pleading stage at
4 the technicalities of what -- whether they have the minimum
5 information to make a claim, whether they want their client to
6 be subject to it at all. You've got to step back and from
7 everything I've heard, it sounds like if Mr. Barish has good
8 reason to show the trustee that Mr. Starr acted negligently,
9 willfully, irresponsibly and generated a huge liability that
10 dwarfs the size of the claim that's being made, that's the
11 easiest and most direct path to getting rid of this. And
12 instead of saying you don't want to talk about it, because you
13 only want to talk about the complaint, is counterproductive,
14 it's not in anybody's interest.

15         You -- the both of you should be talking about that
16 openly. You should be providing that information to the
17 trustee. And I would hope, if you have a good case, the
18 trustee would then act responsibly and just drop this, because
19 you would have quite a significant offset claim.

20         And at the same time, I would expect the trustee
21 recognizes that if he can't find the agreement, and he has to
22 prove day-to-day what the services were, and prove that they
23 totaled 300-and-something thousand dollars in value, in the
24 face of your counterclaim, it's going to be hard for him to do
25 that. He doesn't have the employees, he doesn't have the

1 people.

2       I shouldn't have to be hearing this.  You should be

3 having conversations, it seems to me very obviously, and that

4 you should be able to possibly resolve this matter.  If you

5 can't, then I'll go forward and I'll make a ruling on the

6 motion to dismiss, as I've said, but I really urge you to just

7 step back, stop being suspicious of each other.  You may or you

8 may not agree, but the information's going to come out anyway,

9 so why not share it right up front?  Okay?

10       MR. SNYDER:  Thank you, Judge.

11       THE COURT:  All right.  Thanks.

12       MR. WOLF:  Thank you very much, Your Honor.

13       MR. SKIFF:  Thank you, Your Honor.

14    (Concluded at 11:12 a.m.)

15                    * * * * *

16

17

18

19

20

21

22

23

24

25



1         **C E R T I F I C A T I O N**

2

3      I, Lisa Luciano, court-approved transcriber, hereby

4 certify that the foregoing is a correct transcript from the

5 official electronic sound recording of the proceedings in the

6 above-entitled matter.

7

8

9 _____

10 LISA LUCIANO, AAERT NO. 327     DATE: July 13, 2015

11 ACCESS TRANSCRIPTS, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25

